UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

                    Plaintiff,                    Court File No. 17-cr-183 (1) (PAM/LIB)

        v.

                                                  **REPORT AND RECOMMENDATION**

Joshua Francis Hill,

                    Defendant.

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1, and upon Defendant's Motion to Dismiss Multiplicitous Counts, [Docket No. 28], and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 32]. The Court held a Motions Hearing on September 18, 2017, regarding the parties' pretrial motions.[1] At the Motions Hearing, the parties requested the opportunity to submit supplemental briefing, which was completed on October 4, 2017, after which the Defendant's Motion to Dismiss Multiplicitous County, [Docket No. 28], and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 32], were taken under advisement by the undersigned.

For the reasons set forth below, the Court recommends that Defendant's Motion to Dismiss Multiplicitous Counts, [Docket No. 28], be **GRANTED**, and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 32], be **DENIED**.

---

[1] The Court addressed the parties' pretrial discovery motions by separate order. ([Docket No. 41]).

## I.    RELEVANT FACTS

The facts in this opening paragraph are by way of background only; they come from the Government's allegations in its initial Complaint. On July 7, 2017, FBI Agent Travis C. Putrah swore out a criminal Complaint and Affidavit setting forth probable cause to believe that Defendant had committed the offense of the murder of A.C. (Compl., [Docket No. 1]). On June 25, 2017, the Red Lake Police Department responded to a call and discovered the body of a deceased juvenile male, A.C., who had died as a result of a gunshot wound to the chest. (Compl., [Docket No. 1], 3, 8). A.C.'s legal guardian informed law enforcement that the victim had been "feuding" with Defendant Joshua Francis Hill. (Id. at 4). During additional interviews, other individuals informed law enforcement that on June 24, 2017, they had seen Defendant retrieve a rifle from "his purple van" and take it to the general area in which the victim was later found. (Id. at 4-7). Witnesses in the area at the time reported hearing a single gunshot; they also informed law enforcement that, at Defendant's request, they retrieved a rifle from Defendant's "purple van, [which was] located next to [Gladys Saragosa's] house" and disposed of the rifle on the morning of June 27, 2017. (Id. at 7-8).

The relevant testimony at the September 18, 2017, Motions Hearing was largely limited to the following.

Gladys Saragosa is Defendant's mother. (Sept. 18, 2017, Motions Hearing, Digital Record, 10:32-33).

On June 29, 2017, law enforcement went to Ms. Saragosa's home; there was a maroon minivan parked in Ms. Saragosa's yard which was not visible from the street. (Id. at 10:36-37, 10:45-46). Ms. Saragosa was the registered owner of the van. (Id. at 10:34-35). Ms. Saragosa was not at home at the time, and law enforcement taped the van's doors closed, contacted a

towing company, and had the van towed to the Bemidji Police Department auto theft garage. (Id. at 10:37-38, 10:42-43, 10:45-46). Ms. Saragosa did not give permission for anyone to take the van, and when she returned home on approximately July 3, 2017, she did not know where the van was located. (Id. at 10:37-39).

On July 13, 2017, Ms. Saragosa spoke to agents from the Federal Bureau of Investigation, and she signed a written consent form authorizing a search of the van. (Sept. 18, 2017, Motions Hearing, Digital Record, 10:37-38; Def.'s Exhibit 1). The van was searched on July 20, 2017, and was later returned to Ms. Saragosa. (Id. at 10:42-45).

At the September 18, 2017, Motions Hearing, Ms. Saragosa testified that although she is the registered owner of the van now at issue, Defendant paid for the purchase of the van; Ms. Saragosa's name was put on the title because Defendant was a minor at the time of the purchase. (Sept. 18, 2017, Motions Hearing, Digital Record, 10:34-35). Ms. Saragosa also testified, however, that Defendant was allowed to drive the van only in the presence of a licensed driver. (Id.). According to Ms. Saragosa, beginning in October or November 2016, Defendant drove the van daily until the transmission went out in February 2017, and the van was no longer drivable. (Id. at 10:35-37). At that point, Defendant began using the van to store his papers and some clothing. (Id. at 10:36-37). As of June 2017, when the van was seized, Defendant was still storing his belongings in the van. (Id.).

On July 26, 2017, the Government filed an Indictment charging Defendant with one count of murder in the first degree under 18 U.S.C. § 1111(a), one count of murder in the second degree under 18 U.S.C. § 111(b), and one count of discharge of a firearm during a crime of violence under 18 U.S.C. 924(c)(1)(A)(iii). ([Docket No. 12]).

## II.    DEFENDANT'S MOTION TO DISMISS MULTIPLICITOUS COUNTS, [Docket No. 28]

### A.  Standard of Review

"'The rule against multiplicitous prosecutions is based on the Fifth Amendment's Double Jeopardy Clause, which "protects against multiple punishments for the same offense."'" United States v. Lohse, 797 F.3d 515, 523 (8th Cir. 2015) (citations omitted). "A multiplicitous indictment is impermissible because 'the jury can convict the defendant on both counts, subjecting the defendant to two punishments for the same crime in violation of the double-jeopardy clause[.]" United States v. Sandstrom, 594 F.3d 634, 651 (8th Cir. 2010). There are two ways in which an indictment can charge multiplicitous counts:  (1) the indictment includes more than one count of the same statutory violation based upon the same act, or (2) the same act is charged as violating two distinct statutory provisions. See, Blockburger v. United States, 284 U.S. 299, 304 (1932) (establishing the "elements test," which determines whether charging the same act as violating two distinct statutory provisions is impermissibly multiplicitous); United States v. Hinkeldey, 626 F.3d 1010, 1013 (8th Cir. 2010) (applying the "unit of prosecution test," which determines whether charging more than one count of the same statutory violation is impermissibly multiplicitous). Under the "elements" theory of multiplicity, which Defendant argues in the instant case:

> If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." [The United States Supreme Court has] often concluded that two different statutes define the "same offense," typically because one is a lesser included offense of the other.

Rutledge v. United States, 517 U.S. 292, 297 (1996); see, also, Brown v. Ohio, 432 U.S. 161, 169 (1977) ("[T]he Fifth Amendment forbids . . . cumulative punishment for greater and lesser included offenses.").

### B.  Analysis

As a threshold matter, the Government asserts that Defendant's present Motion to Dismiss Multiplicitous Counts is premature because the trial court will have "the ability to structure jury instructions to include murder in the second degree as a lesser included offense" or could "at sentencing . . . merge counts of conviction to avoid multiple [sic] sentences." (Govt. Mem., [Docket No. 43], 5). In support, the Government cites United States v. Platter, 514 F.3d 782, 786 (8th Cir. 2008). (Id.). However, there are multiple reasons why Platter does not conclusively support the Government's present position.

First, the Eighth Circuit issued its opinion in Platter in 2008. In 2014, Federal Rule of Criminal Procedure 12(b)(3) was amended to provide that a motion alleging 'a defect in the indictment' generally must be raised before trial," including multiplicity objections which are apparent from the face of the indictment. See, United States v. Anderson, 783 F.3d 727, 740 (8th Cir. 2015) (emphasis added); see, also, Fed. R. Crim. P. 12(b)(3)(B)(ii) (identifying multiplicity as a defect in the indictment which must be raised "by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits"). The current timing requirement in Rule 12(b)(3) that issues of multiplicitous indictments generally must be raised before trial undermines the Government's position that Defendant's present Motion on this issue is premature.

Second, although Platter does hold that the Government "has 'broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case"

and "is free to prove a defendant's liability for one criminal offense using multiple theories of guilt," Platter further instructs that such multiple theories of guilt "may be alleged in the conjunctive in one count of the indictment . . . ." See, 514 F.3d at 786. The indictment in the case presently before the Court does not allege the multiple theories of guilt as alternative theories within one count; it clearly charges two separate and distinct counts of murder based on the same alleged conduct which are not pled in the alternative – Count I, for first-degree murder, and Count II, for second-degree murder. (Indictment, [Docket No. 12], 1-2). Therefore, contrary to the Government's assertions, Platter does not "moot" or otherwise render premature Defendant's present Motion to Dismiss Multiplicitous Counts.

Turning to the substance of the Motion, Defendant contends that Count I, which charges first-degree murder, is multiplicitous with Count II, which charges second-degree murder. (Def. Mem., [Docket No. 42], 7). The Government responds that the charges are not multiplicitous because "the elements [of first-degree murder and second-degree murder] are different." (Govt. Mem., [Docket No. 43], 5). The Government's position is an inexact description of the test for whether charges for the violation of different criminal statutes by the same act are unconstitutionally multiplicitous. While the applicable test does require examination of the elements of the crimes charged, as stated above, charging multiple statutory violations based upon the same act is permissible if "'each provision requires proof of a fact which the other does not.'" Rutledge, 517 U.S. at 297.

The relevant statute, 18 U.S.C. § 1111, states:

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as a part of a pattern or practice of assault or

torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

Although the Government points out that, as charged in the Indictment, murder in the first degree requires proof that Defendant unlawfully killed a human being "with malice aforethought and lying in wait and with premeditation," while murder in the second degree does not require proof of lying in wait or premeditation, (Govt. Mem., [Docket No. 43], 4-5); Indictment, [Docket No. 12], 1-2), in order for these two charges to pass the test for multiplicity, "'each provision requires proof of a fact which the other does not.'" Rutledge, 517 U.S. at 297 (emphasis added). In other words, the elements of one of the crimes charged may not be wholly encompassed within the elements of the other crime charged. Where some of the elements of Crime A are identical to all of the elements of Crime B, Crime B is a lesser included offense of Crime A. See, e.g., Evans v. Michigan, 568 U.S. 313, 331 (2013) (the crime of burning real property is a lesser included offense of the crime of burning a house); United States v. Mann, 701 F.3d 274, 286 (8th Cir. 2012) (the crime of owning a machinegun is a lesser included offense of the crime of owning an unregistered machinegun).

Although first-degree murder requires proof of an additional element—as charged herein, lying in wait or premeditation—that second-degree murder does not require, the elements of second-degree murder are wholly encompassed within the elements of first-degree murder; thus, second-degree murder is a lesser included offense of first-degree murder. See, also, United States v. Weise, 89 F.3d 502, 505 (8th Cir. 1996) (recognizing that federal second-degree murder is a lesser-included offense of federal first-degree murder). As such, they are "'same offense'" for purposes of a multiplicity analysis, see, Rutledge, 517 U.S. at 297, and they may not be charged

in separate counts in the Indictment. <u>See</u>, <u>Platter</u>, 514 F.3d at 785 ("An indictment is multiplicitous if it charges the same crime in separate counts.").

The Eighth Circuit has provided instructions on how to avoid such multiplicitous charging:

> [W]e direct the government in future cases to our prior holding that, where a "statute specifies two or more ways in which one offense may be committed, all may be alleged <u>in the conjunctive</u> <u>in one count</u> of the indictment . . . ." This method of procedure would adequately inform the defendant of each allegation that he must defend against while solving any potential multiplicity problems.

<u>United States v. Roy</u>, 408 F.3d 484, 492 n.4 (8th Cir. 2005) (emphasis added) (quoting <u>Gerberding v. United States</u>, 471 F.2d 55, 59 (8th Cir. 1973)).

The remaining question before this Court, therefore, is the appropriate remedy for the presently multiplicitous Indictment. The Government appears to suggest that suitable resolutions would be (1) issuing appropriate jury instructions that clearly inform the jury that second-degree murder is a lesser-included-offense of first-degree murder, or (2) if necessary, for the sentencing court to "merge counts of conviction to avoid multiple sentences." (Gov. Supp. Br., [Docket No. 43], 5). Defendant asks that this Court require the Government to elect whether it wishes to proceed on a charge of first-degree murder <u>or</u> on a charge of second-degree murder and that this Court then dismiss the charge which the Government elects to abandon. (Motion, [Docket No. 28], 2).

As in <u>Roy</u>, supra, most challenges involving multiplicity issues previously typically occured after a defendant's criminal convictions or sentencing. In that context, the Eighth Circuit has held that remand for a new trial after conviction on multiplicitous counts is not necessary if the jury was properly instructed to consider each charge separately; rather, the multiplicitous convictions should be vacated. <u>See</u>, <u>e.g.</u>, <u>United States v. Emly</u>, 747 F.3d 974, 980 (8th Cir.

2014). The case presently before the Court, however, is in the early stages of litigation, and there is no multiplicitous conviction to be vacated. Moreover, the current Federal Rule of Criminal Procedure 12(b)(3) has now made this inquiry a pre-trial one.

The Court is disinclined to recognize the error of a multiplicitous Indictment, and as the Government suggests, still ignore the error because it might be remedied at some later point in this prosecution. Accordingly, the undersigned recommends that Defendant's Motion to Dismiss Multiplicitous Counts, [Docket No. 28], be **granted**, and Count II of the Indictment, charging second-degree murder, be dismissed.[2]

## III. DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE, [Docket No. 32]

### A. STANDING

As a threshold matter, the Government argues that Defendant may not bring the present Motion to Suppress because he lacks standing to do so. (Govt. Mem., [Docket No. 43], 2-4).

#### i. Standards of Review

"The Fourth Amendment protects 'against unreasonable searches and seizures,' but its protections are personal and cannot be asserted [vicariously] by persons lacking a 'legitimate expectation of privacy' in the place searched." United States v. Kuenstler, 325 F.3d 1015, 1020 (8th Cir. 2003) (quoting Rakas v. Illinois, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L.Ed.2d 387 (1978)). In other words, to assert Fourth Amendment rights, an individual "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).

---

[2] The dismissal of Count II will not hinder either party if a jury instruction on the lesser-included-offense of second-degree murder is later desired by either party. See, Fed. R. Crim. P. 31(c) ("A defendant may be found guilty of any of the following: (1) an offense necessarily included in the offense charged"); Schmuck v. United States, 489 U.S. 705, 715-20 (1989) (adopting elements test to determine whether an offense is a lesser included offense of another); Id. at 717 n.9 (noting that this Rule 31(c) "'developed as an aid to the prosecution in cases in which the proof failed to establish some element of the crime charged'" but also "benefits the defendant as well" (citations omitted)).

Multiple factors are relevant to the determination of standing, including: ownership; possession or control of the items seized; historical use of the property; ability to regulate access to the property; the existence of a subjective anticipation of privacy; the objective reasonableness of the expectation of privacy under the specific facts of the case; and the totality of the circumstances surrounding the seizure. See, United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994) (citing United States v. Sanchez, 943 F.2d 110, 113 (1st Cir.1991)). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." Gomez, 16 F.3d at 256. "A seizure [for the purposes of the Fourth Amendment] occurs when 'there is some meaningful interference with an individual's possessory interests' in the property seized." Maryland v. Macon, 472 U.S. 463, 469 (1985) (citation omitted).

### ii. Analysis

The Government contends that there is nothing in the record to support a claim that Defendant had a reasonable expectation of privacy in the van which would give him standing to challenge its seizure or search. (Govt. Mem., [Docket No. 43], 2-4). Defendant disagrees. (Def. Mem., [Docket No. 42], 4-7). The Court likewise disagrees with the Government.

Although the record demonstrates that Ms. Saragosa is the legal owner of the van, the record currently before the Court also shows that Defendant was a regular and primary user of the van, at least from approximately October 2016 through the time the van was seized. The Government emphasizes that Defendant had not driven the van "for months," but even after the van had become inoperable (and up until the time of its seizure), Defendant was permitted to store personal papers and his clothing in it. This use demonstrates a subjective anticipation of

privacy in the van, which was objectively reasonable under the specific facts of this case.[3] As the Government points out, the Eighth Circuit has previously "held that to have a legitimate expectation of privacy by way of a possessory interest, defendant must have possession of the vehicle and the keys." (Govt. Mem., [Docket No. 43], 4); see, also, United States v. Macklin, 902 F.3d 1320, 1330 (8th Cir. 1990) (citations omitted). Contrary to the Government's assertion, however, Macklin actually supports Defendant's argument given the record in the instant case.

In the case presently before this Court, Ms. Saragosa testified at the September 18, 2017, Motions Hearing that Defendant had been given keys to the van. (Sept. 18, 2017, Motions Hearing, Digital Record, 10:34-35). She also testified that Defendant was consistently using the van to store his belongings, which further demonstrates a possessory interest. (Id. at 10:36-37). Although Defendant was not in physical possession of the van at the time of the seizure, the Government has provided no legal authority which creates such a requirement. The evidence does, however, show that Defendant had been regularly driving the van while it was operable, and that he continued to use the van at the time of the seizure, albeit as a storage facility because the van had since become inoperable. There is no evidence that Defendant expected or believed that the items he stored in his vehicle would be accessible to the public. Nor is there any evidence that anyone other than Defendant and Ms. Saragosa controlled access to the van.

The Government notes that Agent Putrah testified at the September 18, 2017, Motions Hearing that during transport after Defendant was arrested, Defendant asked Agent Putrah when the van would be returned to his mother and Defendant referred to the van as his mother's van. (Govt. Mem., [Docket No. 43], 3); (Sept. 18, 2017, Motions Hearing, Digital Record, 10:43-45).

---

[3] The Government's contention that "[t]here is nothing in the record to show that the defendant had a subjective expectation of privacy in the van" is unpersuasive. (See, Govt. Mem., [Docket No. 43], 3). The record now before the Court shows a history and by a totality of the circumstances, that throughout the relevant time period that Defendant was using the van to store personal belongings, he had paid for its purchase, he had keys to it, and he had driven it daily until it was no longer operable.

11

This alone is insufficient to overcome the totality of the evidence which supports a finding that Defendant had a reasonable expectation of privacy in the van. Since Defendant was in custody at the time of the conversation to which Agent Putrah referred at the September 18, 2017, Motions Hearing, Defendant's assumption that the van would be returned to Ms. Saragosa was perhaps a mere practical recognition that the van would likely not be returned directly to Defendant. Similarly, Defendant's reference to the van as his mother's van does not destroy any legitimate co-extensive expectation of privacy Defendant also may have had in the van.

In light of the totality of the evidence in the record and the specific facts and circumstances of this case, the Court concludes that Defendant had an objectively reasonable expectation of privacy in the van. See, United States v. Williams, 714 F.2d 777, 779 n.1 (8th Cir. 1983) (driver with permission to use an automobile had standing to assert Fourth Amendment claims regarding the search and seizure of the automobile); United States v. Portillo, 633 F.2d 1313, 1317 (9th Cir. 1980), cert. denied 450 U.S. 1043 (1981) (driver with keys to automobile and permission to use automobile had standing to challenge a search of its trunk). As such, Defendant has standing to bring the present Motion to Suppress in regards to the seizure and search of the van.

### B.  The June 29, 2017, Seizure

Defendant argues that the June 29, 2017, seizure of the van was illegal because it violated the requirements set forth by the Fourth Amendment. (Def. Mem., [Docket No. 42], 1-4). The Government has completely failed to respond in any way to Defendant's challenge to the initial seizure of the van, instead, as addressed above, arguing only that Defendant does not have

standing to raise Fourth Amendment claims with regards to the van and that the <u>search</u> of the van

complied with the Fourth Amendment.[4] (Govt. Mem., [Docket No. 43], 1-4).

### i. Standards of Review

"The Fourth Amendment . . . provides that '[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated.'" <u>Maryland v. King</u>, ___ U.S. ___, 133 S. Ct. 1958, 1968 (2013). Towing a vehicle and

placing it into a police impound lot is clearly a "seizure." <u>See</u>, <u>Soldal v. Cook Cty., Ill.</u>, 506 U.S.

56, 61 (1992) (holding that pulling a mobile home off of its moorings and towing it onto the

street constituted a "seizure" under the Fourth Amendment); <u>United States v. Brown</u>, 535 F.2d

424, 427-28 (8th Cir. 1976) (holding that towing a car is a substantial invasion of an individual's

legitimate possessory interest in that car). "A warrantless seizure 'is per se unreasonable, unless

the police can show that it falls within one of a carefully defined set of exceptions.'" <u>United</u>

<u>States v. Lewis</u>, 864 F.3d 937, 943 (8th Cir. 2017) (citations omitted). For example, sometimes,

"such as when faced with special law enforcement needs, diminished expectations of privacy,

minimal intrusions, or the like . . . certain general, or individual, circumstances may render a

warrantless . . . seizure reasonable." <u>Id.</u> at 945 (8th Cir. 2017). The Government bears the burden

to show that a warrantless seizure of property was permissible. <u>See</u>, <u>Id.</u> at 947; <u>see</u>, <u>also</u>, <u>United</u>

<u>States v. James</u>, 353 F.3d 606, 615 (8th Cir. 2003) ("If the government wishes to rely on an

---

[4] As to the Government's additional vague assertion that the "generic" nature of Defendant's Motion to Suppress, [Docket No. 32], "did not permit the government to properly prepare for a motions hearing," thus resulting in "litigation by ambush," the Court notes that Defendant's Motion to Suppress, [Docket No. 32], generally stated that he intended to challenge the search, which he characterized as "the fruit of the illegal seizure that predated the consent." This clearly indicates that Defendant would contend that the initial seizure was illegal. Moreover, Defendant's post-Motion Hearing Memorandum was filed on September 27, 2017, and it largely focuses on the legality of the seizure of the van. ([Docket No. 42], 1-4]). In fact, Defendant bases his argument that the <u>search</u> of the van was illegal <u>only</u> on his argument that it was the fruit of the illegal seizure. (<u>Id.</u> at 1 ("This search was illegal because it was the direct fruit of an illegal seizure of the van three weeks earlier.")). The Government chose not to seek the Court's permission to submit additional evidence or reopen the evidentiary hearing as relevant to the legality of the seizure. Rather, the Government appears to have ignored its burden to show the legality of the challenged initial <u>seizure</u>.

exception [to the Fourth Amendment's warrant requirement], it bears the burden of demonstrating that the exception exists." (citation omitted)).

### ii. Analysis

Defendant dedicates the majority of his supplemental briefing on his Motion to Suppress to the legality of the initial June 29, 2017, seizure of the van. (Def. Mem., [Docket No. 42], 1-4). Defendant starts from the general proposition that the warrantless seizure of the van was per se unreasonable, and then he argues why certain exceptions to the general warrant requirement—the exigent circumstances exception, a seizure comparable to a Terry stop, and the automobile exception—do not apply under the circumstances of this case. (Id.).

The record now before the Court contains very little evidence about the initial seizure. The Government has proffered no explicit justification for the seizure. The Court's independent review of the record shows that the Affidavit accompanying the initial Complaint, [Docket No. 1], relates that on the day of A.C.'s death, a witness had informed the Government that Defendant had retrieved a rifle from his van and later replaced it there; this is the only basis in the present record now before the Court that could explain the basis for the van's initial seizure. Although it appears from the Affidavit that on the day they seized the van—June 29, 2017—law enforcement knew only that a source had informed them that Defendant had placed a rifle back into the van at some point, the Government has not asserted before this Court as of the present Motion that the initial seizure was motivated in any way by this information. Moreover, the Affidavit also clearly sets forth that the rifle was recovered from a different location on June 30, 2017, yet law enforcement continued to hold the van, which may impact the legality of the initial seizure of the van. See, United States v. Jacobsen, 466 U.S. 109, 124 & n.25 (1984) (stating that a seizure lawful at its inception may become unreasonable and therefore violate the Fourth

Amendment if the length of the seizure unduly intrudes upon constitutionally protected interests). In addition, it appears from Ms. Saragosa's undisputed testimony that at the time of the seizure, the van was parked on her private property, out of sight of the street, which could be problematic as well. See, G.M. Leasing Corp. v. U.S., 429 U.S. 338, 354 (1977) ("It is one thing to seize without a warrant property resting in an open area . . . without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property . . . situated on private premises to which access is not otherwise available for the seizing officer.").

Simply put, there is not adequate evidence in the record now before the Court to properly establish the circumstances surrounding the initial seizure of the van. What is plain, however, is that the record contains no evidence that the seizure was undertaken pursuant to a warrant, and such a warrantless seizure is per se unreasonable unless an exception to the warrant requirement applies. See, Lewis, 864 F.3d at 943.

The Court declines to follow Defendant's example and analyze the various exceptions to the warrant requirement which the Government might have asserted to see if those exceptions apply under the circumstances presented in the case now before the Court. As already set forth above, the Government bears the burden to show that a warrantless seizure of property was permissible. See, Lewis, 864 F.3d at 947. In the instant case, the Government has not submitted any evidence of a warrant for the June 29, 2017, seizure of the van. Nor has the Government even attempted to identify any exception to the general warrant requirement which could permit the warrantless, initial seizure of the van which took place. Therefore, the Court finds that the Government has failed to meet its burden to show that the seizure was permissible. As such, the warrantless, initial seizure of the van was unreasonable and violated the protections set forth in the Fourth Amendment.

### C. The July 20, 2017, Search

Defendant next argues that the July 20, 2017, warrantless search of the van was illegal because it was the fruit of the prior illegal seizure of the van, so any evidence recovered during that search should be suppressed. (Def. Mem., [Docket No. 42], 1). The Government argues that the search was permissible because it was done pursuant to Ms. Saragosa's voluntary consent to the search. (Govt. Mem., [Docket No. 43], 1-2

#### i. Standards of Review

> A warrantless search of an automobile . . . is allowed under the Fourth Amendment . . . if the officer has obtained voluntary consent, provided that the search is limited to the scope of the consent. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 2189 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").

<u>United States v. Murillo-Salgado</u>, 854 F.3d 407, 417 (8th Cir. 2017).

> "[T]he exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" However, courts will not exclude evidence discovered as a result of an illegal search or seizure "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance."
> Consent can be an intervening circumstance if the government shows "(1) that the . . . consent was voluntary and (2) that 'the consent was an independent act of . . . free will that purged the taint of the Fourth Amendment violation.'" . . . To determine whether consent has purged the taint of a Fourth Amendment violation, courts consider: "(1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the agents' Fourth Amendment violation."

<u>United States v. LeBeau</u>, 867 F.3d 960, 972 (8th Cir. 2017) (citations omitted).

#### ii. Analysis

It is undisputed that Ms. Saragosa consented to the July 20, 2017, search of the van. (Def. Mem., [Docket No. 42], 1, 4). The <u>only</u> argument Defendant gives in support of his position that

the search violated his Fourth Amendment rights is that the search occurred after the illegal, initial seizure of the van. (Id. at 1-7).

As an initial matter, the Court finds that Ms. Saragosa's consent to the search was both voluntary and valid.[5] "[C]onsent [is] involuntary where an individual's will is overcome by coercive police activity and [s]he loses the capacity for self-determination." United States v. Williams, 760 F.3d 811, 815 (8th Cir. 2014) (citation omitted).  At the September 18, 2017, Motions Hearing, Ms. Saragosa testified that she consented to the search of her own free will, voluntarily, and that she had no objection to the search. (Sept. 18, 2017, Motions Hearing, Digital Record, 10:39-41). There is absolutely no evidence before the Court that Ms. Saragosa was in any way coerced into giving her consent to the search of the van or that she attempted at any time to withdraw that consent.

Moreover, the record before the Court sufficiently establishes that Ms. Saragosa was an individual who could properly consent to the search of the van. Not only was she the registered owner of the van, (See, Sept. 18, 2017, Motions Hearing, Digital Record, 10:34-35, 10:39-40), she was also in the position to consent as an individual with joint control over and access to the van. See, United States v. Clutter, 574 F.3d 980, 983 (8th Cir. 2012) (holding that an individual with joint access or control of property "has the right to permit the inspection [of such property] in [her] own right and that the others [who have joint access or control] have assumed the risk that one of their number might permit the common area to be searched" (citations omitted)). When officers receive such "third-party consent," "the Fourth Amendment is not violated if the officers reasonably relied on the third party's apparent authority to consent, because the Amendment's reasonableness requirement demands of government agents, 'not that they always

---

[5] Defendant does not argue that Ms. Saragosa's consent to the search was involuntary or otherwise invalid.

be correct, but that they always be reasonable.'" Id. (quoting Illinois v. Rodriguez, 497 U.S. 177, 185 (1990)).

When the van was initially seized, it was located in Ms. Saragosa's yard, at her home. She was the registered owner of the van. When law enforcement officers later came to her home and obtained her written consent to search the van, she did not tell those officers that the van belonged to Defendant. Under these specific facts, it was reasonable for the officers to conclude that Ms. Saragosa had the authority to give consent to search the van.

Notwithstanding the consent, Defendant contends that the fruit of the poisonous tree doctrine should apply to render anything found during the search of the van inadmissible. (Def. Mem., [Docket No. 42], 1). However, the initial, illegal seizure of the van does not automatically require the suppression of any evidence found during the subsequent search of the van. If the illegal seizure is sufficiently attenuated from the otherwise-legal search, evidence found in the subsequent search need not be suppressed.

The attenuation doctrine is an established exception to the exclusionary rule. United States v. Lawrence, No. 05-cr-333 (MJD/RLE), 2006 WL 752920, *6 (D. Minn. March 23, 2006) (citing United States v. Watson, 950 F.2d 505, 507 (8th Cir. 1991)). Broadly speaking, under the attenuation doctrine, "[t]he controlling question is '"whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."'" See, United States v. Yousif, 308 F.3d 820, 829 (8th Cir. 2002). When the Government asserts that consent given after the initial illegal act sufficiently purged the taint of the initial illegal act from a subsequent search, it must show that such consent (1) was voluntary and (2) "purged the taint of the Fourth Amendment violation," which is determined by

considering "(1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the agents' Fourth Amendment violation." See, LeBeau, 867 F.3d at 972 (citations omitted). In the instant case, Ms. Saragosa expressly testified at the September 18, 2017, Motions Hearing that her consent to search the van was given voluntarily and of her own free will. Therefore, the only question left is whether her consent sufficiently purged the taint of the initial, illegal seizure of the van.

Courts "'measure temporal proximity [for purposes of determining attenuation] from the point at "which the agents' conduct becomes illegal to the time of the consent." The closer in time the illegal [act] and the . . . consent occurred, the more likely the illegal [act] influenced the consent.'" LeBeau, 867 F.3d at 972 (citations omitted). In the present case, the unjustified warrantless seizure occurred on June 29, 2017, and Ms. Saragosa did not give her consent to search the van until June 13, 2017, over 2 weeks later. "In some circumstances, even a lapse of fifteen minutes can be 'sufficient to demonstrate an attenuation of the illegality.'" LeBeau, 867 F.3da t 972 (citation omitted).

Next, "'[t]he presence of intervening circumstances that provide . . . an opportunity "to pause and reflect, to decline consent, or to revoke consent" help demonstrate that the illegality was attenuated.'" Id. at 973. In the present case, such intervening circumstances occurred between the time of the seizure and the time of Ms. Saragosa's consent to search. During that time, Defendant was arrested and detained on the charge of first degree murder of A.C., (see, [Docket Nos. 6 and 7]), so there was likely little confusion on the part of Ms. Saragosa as to the reason law enforcement wanted to search the van in which Defendant stored his belongings. Yet, Ms. Saragosa had no objections to the search, and she consented freely and voluntarily to the

19

search. In addition, the consent form that Ms. Saragosa signed explicitly stated that she had been advised of her right to refuse consent, which may be considered as an intervening factor. (See, Def.'s Exh. 1). See, United States v. Moreno, 280 F.3d 898, 901 (8th Cir. 2002) (holding that notice of right to refuse consent "supports the voluntariness of . . . consent indicating that the [officer] was not attempting to exploit an illegal situation").

"Finally, '[t]he Supreme Court has placed "particular" emphasis on the purpose and flagrancy of the official misconduct.' In evaluating this factor, courts consider whether the violation was 'investigatory in design and purpose,' and whether the officers used force, threats, or intimidation." LeBeau, 867 F.3d at 973 (citations omitted). Here, although the seizure of the van presumable was for an investigatory purpose, no search of the van was conducted until after Ms. Saragosa consented to such a search, which lessens the flagrancy of the initial misconduct. Additionally, there is no evidence that law enforcement used force, threats, or intimidation to seize the van. Ms. Saragosa testified that she was not even home at the time of the initial seizure; she was out of the state and did not realize the van was no longer in her yard until days later. (See, Sept. 18, 2017, Motions Hearing, Digital Record, 10:37-38).

Considering all of these factors and the specific circumstances of this case, the Court concludes that Ms. Saragosa's voluntary consent to the search of the van was sufficiently attenuated from the initial, illegal seizure of the van that the illegal seizure did not taint the subsequently obtained consent. Therefore, the exclusionary rule does not warrant suppression of the results of the search of the van, and the undersigned recommends that Defendant's Motion to Suppress, [Docket No. 32], be **denied.**

20

### III.    CONCLUSION

A. Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

B. Defendant's Motion to Dismiss Multiplicitous Counts, [Docket No. 28], be **GRANTED**; and

C. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 32], be **DENIED**.

Dated: October 16, 2017                                  s/Leo I. Brisbois
                                                         The Honorable Leo I. Brisbois
                                                         United States Magistrate Judge

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.